

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2013 JAN 31  PM 2: 36

LORETTA G. WHYTE
CLERK

FELONY

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**BILL OF INFORMATION FOR CONSPIRACY
TO COMMIT HEALTH CARE FRAUD**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. 13 - 017 |
| VERSUS | * | SECTION:  SECT. L  MAG. 4 |
| SIRANUSH TULUMDZHYAN | * | VIOLATIONS: *18 USC §371* |
| LA MEDICAL GROUP, INC. | | *18 USC§982(a)(7)* |

* * *

## COUNT 1

**A.    AT ALL TIMES MATERIAL HEREIN:**

1.    **Medicaid**:  The Medicaid Program was a jointly funded cooperative venture between the federal and state governments, administered by the states, that provided health care benefits for certain groups, primarily the poor and disabled.

2.    In order to bill the Medicaid program, a health care provider completed an enrollment application to be approved for participation in the program.  Once approved, the provider was able to submit claims for payment for eligible services rendered to recipients.

3.    The Louisiana Medicaid Program was designed to pay health care providers promptly for billed services without, in most instances, requiring any verification that billed services were actually performed prior to issuing payments.   Suspicious billing, such as bills for

1

services not ordinarily performed by a physician of a particular speciality, were typically investigated only after payments for services were made.

4.     When a provider signed Medicaid enrollment forms, the provider agreed to abide by all policies and regulations of the Louisiana Medicaid Program and certified that the information contained on the claim forms were true, accurate and complete, to the best of their knowledge.  The provider also agreed that concealment of a material fact or the submission of a false or fraudulent claim could result in prosecution under applicable federal and state laws.

5.     Medicaid bills were determined by what was contained on a "superbill," a form ordinarily completed by a physician after medical services were provided during a physician visit.  Information from a superbill was used by providers, or billers hired by the providers, to complete a Form 1500, the recognized standard claim form within the health industry.  The completed form contained the name of the recipient, dates of service, the types of services provided, the diagnosis code, the name of the facility where the services were rendered, and the physician and supplier of the service.

6.     Medicaid was a health care benefit program as defined in Title 18, United States Code, Section 24(b).

7.     **Current Procedural Terminology**:  Actual services provided to recipients were billed to Medicaid by using procedure codes defined by the Current Procedural Terminology (CPT) Manual.  The CPT Manual was a uniform, universally recognized system of medical services coding, promulgated by the American Medical Association, which assigns five-digit numeric designations to individual medical procedures.  The CPT Manual defined the procedural and medical requirements that must be met in order for a provider to bill for a particular medical service.

2

8.      **Nerve Conduction Studies**: CPT Codes 95900, 95903 and 95904 described Nerve Conduction Velocity (NCV) tests, minimally invasive tests where leads were attached to the skin and small electric shocks were administered along a particular nerve. These tests were usually ordered by Orthopaedists and Neurologists to assess nerve damage and were not usually performed by general or family practitioners. It was the standard of appropriate care that NCV tests were performed in conjunction with electromyography (EMG) tests. An EMG test was a painful and invasive procedure that required the insertion of needles into the muscles to determine how muscles contracted and reacted to the stimulus provided to the nerves. The reason for doing the NCV and EMG tests in conjunction was to look for damage to the spinal cord, brain or nerves that was causing weakness, numbness or pain in muscles.

9.      Reimbursement for CPT Codes 95903 and 95904 was based on the number of leads or units measured, with six being the maximum reimbursed by Medicare for a single visit. An NCV test was focused on a particular nerve, and orthopaedists or neurologists usually did not run the test on the maximum number of units and on multiple extremities. Also, an interpretation of NCV results created by someone not properly trained in neurology or physiology had no clinical value and would, therefore, not be reimbursable under Medicaid regulations. Although the clinics herein routinely billed for NCV tests with the maximum number of leads and on multiple extremities, no physician or clinic personnel ever performed an EMG test on any Medicaid patient.

10.     **Pulmonology Studies**: CPT codes 94010, 94070, 94200, 94240, 94350, 94370, and 94720 were non-screening pulmonary tests ordinarily performed in response to a patient complaint. CPT Code 94200 was a pulmonary function test performed by a pulmonologist that was more sophisticated than a basic spirometry test (CPT Code 94010). CPT Code 94240 was a

3

pulmonary function test that required the patient to inhale helium, nitrogen and/or other gases. This test was performed by a pulmonologist who measured the amount of nitrogen or helium that remained in the patient's lungs.

11.     **Cardiac Studies**:  CPT Codes 93000 and 93306 were diagnostic procedures ordinarily performed by cardiologists by obtaining ultrasonic signals from the heart and arteries, with two-dimensional image and/or Doppler ultrasonic signal documentation.

12.     **LA MEDICAL GROUP, INC.:   SIRANUSH TULUMDZHYAN (TULUMDZHYAN)** was the owner and President of **LA MEDICAL GROUP, INC. (LA MEDICAL)** located at 4428 Conlin St, Suite A, Metairie, Louisiana.  **TULUMDZHYAN** also operated as a technician.

13.     **LA MEDICAL** was incorporated in Louisiana in December 2010.

14.     "Doctor" was a licensed Medical Doctor operating as a general practitioner with **LA MEDICAL**.  Doctor also operated as a physician in other health care clinics owned and operated by associates of **TULUMDZHYAN.**

15.     A third party biller was identified to Medicaid as the designated contact person for **LA MEDICAL** in matters concerning **LA MEDICAL'S** enrollment applications.  The third party biller prepared and submitted claims for payment to Medicaid on **LA MEDICAL'S** behalf in return for a fee.  The third party biller also completed an extensive certification which stated, in part, that claim information submitted to Louisiana Medicaid was an exact duplicate of detailed claim line information received from **LA MEDICAL** and that the electronic claim information submitted was true, accurate, and complete and not materially changed.

16.     In or about December 2010, **LA MEDICAL** entered into a provider agreement with Medicaid and was assigned a Provider Identification Number (PIN). The third party biller, on behalf of **LA MEDICAL,** used the PIN to submit claims to the Louisiana Medicaid Program for services it claimed **LA MEDICAL** provided to qualified recipients.

**B.     THE CONSPIRACY:**

17.     Beginning in or about December 16, 2010, and continuing until on or about April 20, 2011, in the Eastern District of Louisiana and elsewhere, the defendants, **SIRANUSH TULUMDZHYAN** and **LA MEDICAL GROUP, INC.**, and others known and unknown to the United States Attorney, willfully and knowingly did combine, conspire, confederate and agree together and with each other to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicaid and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of the Louisiana Medicaid Program in connection with the delivery of and payment for health care benefits and services, to-wit: **TULUMDZHYAN** and **LA MEDICAL**, and others caused false claims for physician and diagnostic services that were neither rendered nor medically necessary to be submitted to the Louisiana Medicaid Program in violation of Title 18, United States Code, Section 1347.

**C.     OBJECT OF THE CONSPIRACY:**

18.     Co-conspirators of **TULUMDZHYAN** purchased and created health care clinics which existed for only short times, usually about a year. Once the clinic owner exhausted the clinic patient population by fraudulently ordering, performing and billing for the medically unnecessary diagnostic services, the owner closed and dissolved the medical clinic and used a technician from the newly closed clinic as the new owner of the next clinic. Often the location,

5

equipment, and staff of the new clinic did not change. Only the ownership and the Medicaid PIN numbers were different. Patients who returned for legitimate medical services or to obtain narcotic prescriptions would again be fraudulently ordered to submit to unnecessary diagnostic testing even though the diagnostic services had been performed on that same patient at the previous clinic in the same location by the same physician. If the patients refused the diagnostic testing, the narcotic prescriptions were routinely withheld from the patient.

19.     **TULUMDZHYAN** worked as a an untrained and uncertified medical technician at Metairie Health Center, Inc. (Metairie Health). Doctor also practiced at Metairie Health as the sole physician. When Metairie Health closed in December 2010, **TULUMDZHYAN** opened **LA MEDICAL** in the same location. Doctor remained the physician at the location. The only patients of **LA MEDICAL** were Medicaid recipients. The services most often billed by **LA MEDICAL** were diagnostic tests involving the patients' nervous, pulmonary, and cardiac systems.

20.     **TULUMDZHYAN** accepted patients who were referred from other clinics owned and operated by co-conspirators to **LA MEDICAL** (shared patients). After a patient was "shared" the patient received the same series of unnecessary tests and diagnostic procedures. By sharing patients, the conspirators caused repetitive billings to Medicaid for identical, unnecessary services performed at multiple clinics.

21.     Once a clinic closed, including Metairie Health, the patients' medical charts were relocated to a storage facility so that the new clinic owner at that location could falsely justify repeating the voluminous diagnostic tests that were then rebilled to Medicaid under a newly assigned provider number.

22.     The technicians at **LA MEDICAL**, including **TULUMDZHYAN**, were not

properly trained to perform the diagnostic testing on the patients. False certificates were

provided by a California company and its owner to make it appear that the technicians at **LA**

**MEDICAL** were properly trained to operate the complex diagnostic testing equipment. Some of

the CPT codes billed by **LA MEDICAL** required the use of sophisticated equipment usually

found in specialty or training hospitals. **LA MEDICAL** did not have the equipment necessary to

properly perform some of the tests.

23.     Approximately 417 Medicaid recipients sought services at **LA MEDICAL** during

its existence. Most of those recipients were billed for receiving the same or a combination of the

same series of diagnostic tests and procedures. Specifically, out of about the 417 Medicaid

recipients, **LA MEDICAL** caused Medicaid to be billed for the following approximate number

of procedures:

| CPT Code | Description | Medicaid Recipients (out of 417) |
|---|---|---|
| 93000 | Electrocardiogram, Complete | 408 |
| 93306 | Echocardiography, transthoracic with Doppler, Complete | 404 |
| 94070 | Evaluation of Wheezing | 399 |
| 94200 | Lung Function Test | 399 |
| 94240 | Residual Lung Capacity | 399 |
| 94350 | Lung nitrogen washout curve | 399 |
| 94370 | Single breath airway closing volume | 399 |
| 94720 | Monoxide Diffusing Capacity | 399 |
| 95900 | Motor Nerve Conduction Test | 360 |
| 95903 | Motor nerve conduction test, with F-wave study | 360 |
| 95904 | Nerve conduction sensory | 360 |

24.     Despite billing for performing the NCV tests on 360 Medicaid recipients, no **LA MEDICAL** personnel performed an EMG on a patient.

25.     The false and fraudulent billings for services that were not performed, medically unnecessary, and performed in such a manner as they had no clinical value caused by **TULUMDZHYAN**, **LA MEDICAL**, and others resulted in losses to the Louisiana Medicaid Program totaling approximately of $494,268.

**E.     OVERT ACTS:**

In furtherance of the conspiracy and to accomplish the purposes thereof, **SIRANUSH TULUMDZHYAN** and **LA MEDICAL GROUP, INC.**, and other individuals and clinics, committed and caused to be committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

26.     Between about September 15, 2010 and December 15, 2010, **TULUMDZHYAN** received approximately $$18,500 in compensation from Metairie Health for her work as a untrained and uncertified medical technician.

27.     Between about January 15, 2011 and April 15, 2011, **TULUMDZHYAN** received approximately $13,089 in compensation from **LA MEDICAL** for her work as a untrained and uncertified medical technician.

28.     Between December  2010 and April 2011, **TULUMDZHYAN** falsely completed documentation that she transmitted to a third party biller in order to fraudulently bill for services she claimed were provided at **LA MEDICAL**.

29.     Between March 2, 2011 and April 20, 2011, **TULUMDZHYAN** and **LA MEDICAL** caused fraudulent payments to be made from the Louisiana Medicaid Program to **LA MEDICAL** in the approximate amount of $494,268.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF HEALTH CARE FRAUD FORFEITURE

1.      The allegations contained in Count 1 are hereby incorporated as though fully set forth herein for the purpose of charging criminal forfeiture to the United States of America pursuant to Title 18, United States Code, Section 982(a)(7).

2.      As a result of the offenses alleged in Count 1, the defendants, **SIRANUSH TULUMDZHYAN** and **LA MEDICAL GROUP, INC.** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense and all property traceable to such property as a result of the violations of Title 18, United States Code, Section 371, which is a federal health care offense within the meaning of Title 18, United States Code, Section 24, including but not limited to:

   a.      $269,057.11 U.S. Currency seized from Capital One Bank Account Number: 2081882889 in the name of LA Medical Group, Inc.

   b.      $494,268 in United States Currency and all interest and proceeds traceable thereto.

   c.      The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.      If any of the above-described forfeited property, as a result of any act or omission of the defendants:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred, sold to, or deposited with, a third person;

   c.      has been placed beyond the jurisdiction of the Court;

   d.      has been substantially diminished in value; or

9

e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) to

seek forfeiture of any other property of said defendants up to the value of the above forfeitable

property.

All in violation of Title 18, United States Code, Section 982(a)(7).


DANA BOENTE
UNITED STATES ATTORNEY


FRED P. HARPER, JR. (6566)
First Assistant United States Attorney


PATRICE HARRIS SULLIVAN (14987)
Assistant United States Attorney


New Orleans, Louisiana
January 31, 2013

10

No. _____

# United States District Court

## FOR THE

EASTERN _____ DISTRICT OF ____ LOUISIANA

UNITED STATES OF AMERICA

*vs.*

SIRANUSH TULUMDZHYAN
LA MEDICAL GROUP, INC.

## BILL OF INFORMATION FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD

Violation(s):

18 U.S.C. § 371
18 U.S.C. § 982(a)(7)

Filed _____, 20 __13

_____, *Clerk.*

By _____, *Deputy*

*Assistant United States Attorney*
JORDAN GINSBERG